# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51027

VETERANS PARK NEIGHBORHOOD )
ASSOCIATION, INC., an incorporated Idaho )
nonprofit & registered neighborhood )
association of the City of Boise, )
)
   Petitioner-Appellant, )
)
v. )
)
CITY OF BOISE, an Idaho municipal )
corporation, )
)
   Respondent-Respondent on Appeal, )
)
and )
)
INTERFAITH SANCTUARY HOUSING )
SERVICES, INC., )
)
   Intervenor-Respondent. )

Boise, October 2024 Term

Opinion filed: January 22, 2025

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Cynthia Yee-Wallace, District Judge.

The decision of the district court is <u>reversed</u> and the case <u>remanded</u> with instructions to invalidate the action of the Boise City Council.

Ertz Law, PLLC, Boise for Appellant. Brian A. Ertz argued.

Boise City Attorney's Office, Boise, for Respondent City of Boise. James B. Smith argued.

Clark Wardle, LLP, Boise, for Intervenor-Respondent Interfaith Sanctuary Housing Services, Inc. Geoffrey M. Wardle argued.

---

MOELLER, Justice.

This case concerns a challenge to the Boise City Council's (the "Council" or "City Council") approval of Interfaith Sanctuary Housing Services, Inc.'s ("IFS") application for a

1

conditional use permit ("CUP"). IFS sought to relocate from its downtown facility and operate a new shelter home facility in Northwest Boise. When the Planning and Zoning Commission initially denied the application, IFS appealed the decision to the City Council, which ultimately reversed the Commission's decision and granted the CUP. Veteran's Park Neighborhood Association, Inc. ("VPNA"), a neighborhood association near the proposed location for the facility, sought reconsideration of the City Council's decision. When reconsideration was denied, VPNA petitioned the district court for judicial review, which upheld the City Council's grant of the CUP. VPNA appealed to this Court. For the reasons explained below, we reverse the decision of the district court and remand this matter with instructions to invalidate the action of the City Council.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On April 27, 2021, IFS applied for a CUP to operate a "large-scale low-barrier, congregate shelter home" at 4306 West State Street in Boise ("the Site"). The facility would provide housing and services to the homeless population of Boise. IFS had purchased the Site to replace its existing shelter located at 1620 River Street in Downtown Boise. IFS sought to relocate to a site large enough to accommodate the growing demand for services and housing, as the current location had "proven to be too constrained."

The Site fronts West State Street in Northwest Boise. It is approximately 2 acres in size and contains a vacant 30,000 square foot building. The Site is zoned as C-2D (General Commercial with Design Review), which allows commercial, retail, and residential use. Notably, the Boise City Code only allows shelter homes in four "zones" (with C-2D being one such zone), all of which require a CUP. At the time of these proceedings, the Boise City Code defined a shelter home as "[a] facility providing basic services that may include food; personal hygiene support; information and referrals; employment, mail, and telephone services; including overnight sleeping accommodations, to people with limited financial resources, including people who are homeless." B.C.C. § 11-012-02.1.P(2). The City of Boise's Comprehensive Plan, which establishes a broad vision for the growth and development of Boise, suggests that shelter homes should be placed in the downtown area of Boise. For example, "homeless shelters" are only addressed within the section of the Comprehensive Plan dealing with "Downtown Policies." However, there is no provision in the Comprehensive Plan that explicitly states that homeless shelters may only exist in Downtown Boise.

2

IFS's proposed relocation to the Site was controversial and drew much public attention, giving rise to unique circumstances surrounding the CUP application. After initially applying for the CUP, IFS agreed to pause consideration of its application on June 11, 2021, at the request of the City of Boise. Notably, this was not a requirement of the CUP process but was instead an unusual ask. The City of Boise requested this pause in order to create the Shelter Better Taskforce, which would evaluate the standards and practices of homeless shelters in the city, as well as to recommend suitable locations for future shelter homes. The Taskforce consisted of representatives from IFS, VPNA, other neighborhood associations, faith and business leaders, and other knowledgeable individuals. IFS reluctantly agreed to pause its CUP application during this process. The Taskforce met throughout the summer of 2021 and ultimately issued its "Recommendation Report," laying out its findings and recommendations as it related to shelter facilities in Boise. Thereafter, IFS revised its CUP application with a supplemental submittal, purporting to incorporate the findings in the Recommendation Report into its application. Along with IFS's application, city planning staff received input from numerous agencies, such as emergency service providers, and submitted "a comprehensive analysis of the applicable criteria and recommendation of approval with conditions."

The Planning and Zoning Commission ("PZC") held an initial hearing on the revised application on November 15, 2021, followed by additional public testimony on December 6 and 13. At these hearings, the PZC received presentations from IFS, VPNA, city planning staff, and members of the public. VPNA actively opposed the CUP application during the PZC hearings, alleging intense adverse impacts would occur to the surrounding area if the shelter were to be located at the proposed site. The PZC considered an extensive amount of evidence, both for and against the CUP application. Some of the key evidence introduced included: data documenting the number of crimes at the existing location compared to the new Site; Boise Police Department ("BPD") and Boise Fire Department ("BFD") testimony on the impacts of increased calls for service in the area; literature, studies, and government publications on a wide range of topics related to operation and impacts of homeless shelters; the Shoreline Urban Renewal District Crime Prevention Through Environmental Design ("CPTED") Assessment performed by BPD that surveyed and summarized crimes in the district and at the existing site; written analysis on the application by BPD; testimony from Ada County Highway District; and testimony from experts on homelessness, real estate, business, and city planning. One piece of evidence *not* included was

3

IFS's security plan for the proposed facility. Despite the PZC requesting that IFS produce such a plan (and BPD recommending a plan be drafted by the applicants), IFS refused to supply even a draft of a plan on the grounds that it was not required by code to submit a security plan as a part of its application.

On January 3, 2022, the PZC voted five to one to deny the application and one week later adopted a written decision explaining the reasons for its denial. In its written decision, the PZC found that the shelter home use did not meet the approval criteria for a CUP under Boise City Code section 11-03-04(6)(C)(7), the code section that provides the standards by which the PZC evaluates CUPs. Applying the criteria directly from the City Code, the PZC's decision stated that the proposed use:

> (1) was not compatible to other uses in the general neighborhood, consisting of "convenience, neighborhood, community and regional shopping centers, hotels and motels, car sales, restaurants, entertainment, and similar uses; limited outpatient medical uses;"
>
> (2) would place an undue burden on public facilities, specifically Fire Station #5 and the Willow Lane Subdivision for the Boise Police Department;
>
> (3) would adversely affect other property in the vicinity; and
>
> (4) was not supported by sufficient information regarding mitigating the adverse effect the development would have on other properties, such as a security or operations plan.

In support of its decision, the PZC primarily pointed to three things in the record: first, the Shoreline Urban Renewal District CPTED Assessment, performed October 15, 2020, by BPD; second, the lack of assurances from BPD and BFD that adverse impacts from the shelter could be mitigated; and third, the lack of a draft security plan from IFS for the Site. The PZC stated that "the application materials did not allow [it] to identify adequate conditions to mitigate adverse impacts in light of the record and agency comments." It further noted that "[t]he proposed use has the high potential for future, extremely negative, adverse impact to the surrounding neighborhood."

IFS subsequently appealed the PZC's denial of its application to the Boise City Council, arguing the PZC had committed several errors in denying its application. This appeal was again supported by city planning staff, while VPNA continued to actively oppose the CUP application on appeal. The Council dedicated what it characterized as "an unprecedented amount of time" to the matter, holding hearings over the course of five days: April 18, 19, 20, 21, and 25, 2022. During

4

those hearings, hundreds of people testified, ranging from VPNA members; individuals from nearby businesses; IFS representatives; staff members from BPD, BFD, Boise Parks and Recreation, and the Boise Public Library; as well as members of the public. The Council also considered the extensive written comments and materials in the record from the proceedings before the PZC. The agency record contains "transcripts of nearly forty hours of presentations, testimony and deliberations before the [PZC] and the City Council, together with thousands of letters, emails, powerpoint slides, studies, and reports."

Ultimately, the Council voted four to two to reverse the decision of the PZC and granted the CUP. It adopted a written statement in support of this decision on May 24, 2022. In reversing the PZC, the Council found the PZC erred in three ways:

> (1) the [PZC] did not adequately examine whether additional conditions of approval could have brought the proposed use into compliance with the required findings for a Conditional Use Permit;

> (2) the proposed use satisfies all ordinance criteria as appropriately conditioned;

> (3) the [PZC] did not evaluate the record to identify objective standards and the necessary elements for further application material that it determined [IFS] had failed to provide, and such decision was arbitrary, capricious, or an abuse of discretion without a rational basis.

It also found that IFS's application met all criteria for a CUP under Boise City Code section 11-03-04(6)(C)(7). Along with its reasoned statement, the Council outlined 30 Conditions of Approval for the proposed shelter. VPNA's request for reconsideration of the Council's decision was denied on June 17, 2022.

On July 11, 2022, VPNA filed a petition for judicial review, seeking to overturn the Council's decision to reverse the PZC's decision and grant the CUP. On August 19, 2022, IFS filed an unopposed petition to intervene in the case, which was granted on August 24, 2022. On September 6, 2022, in a different proceeding, IFS submitted a Design Review Application to the City of Boise, proposing an updated and revised design plan for the proposed shelter, which was approved on October 22, 2022. On October 28, 2022, VPNA moved to stay the proceedings in the district court and remand the matter to the Council "for fact findings germane to the design element changes" found in the updated Design Review Plan. The district court denied the motion to remand on December 12, 2022. Following oral argument on the petition for judicial review, the district court issued its decision upholding the Council's decision granting the CUP, finding no error in

the Council's actions. It issued a judgment dismissing the petition on July 12, 2023. VPNA timely appealed to this Court.

<h2 style="text-align:center">II.  STANDARDS OF REVIEW</h2>

The Local Land Use Planning Act ("LLUPA") permits an affected party to seek judicial review of the approval or denial of a land use application, as provided for in the Idaho Administrative Procedure Act ("IDAPA"). I.C. § 67-6521(1)(d); *see also 917 Lusk, LLC v. City of Boise*, 158 Idaho 12, 14, 343 P.3d 41, 43 (2015). On appeal, "[t]he actions of a governing board are afforded a strong presumption of validity." *North West Neighborhood Ass'n v. City of Boise*, 172 Idaho 607, 613, 535 P.3d 583, 589 (2023) (citing *Duncan v. State Bd. of Acct.*, 149 Idaho 1, 3, 232 P.3d 322, 324 (2010)). When this Court reviews a land use decision made by a governing board, it does not substitute its own judgment for that of the governing board. *Id.* Instead, a land use decision "*shall* be affirmed" unless this Court determines the governing board's findings, inferences, conclusions, or decisions, were:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) not supported by substantial evidence on the record as a whole; or

(e) arbitrary, capricious, or an abuse of discretion.

*Id.* (emphasis in original) (quoting I.C. § 67-5279(3)). "Importantly, even if a land use decision is made in violation of section 67-5279(3), the governing board's decision must still be affirmed unless substantial rights of the appellant have been prejudiced." *Id.* (citing I.C. § 67-5279(4)).

When a district court acts in its appellate capacity under the IDAPA, this Court "review[s] the district court's decision as a matter of procedure." *Jasso v. Camas County*, 151 Idaho 790, 793, 264 P.3d 897, 900 (2011) (citing *St. Luke's Magic Valley Reg'l Med. Ctr., Ltd. v. Bd. of Cnty. Comm'rs of Gooding Cnty.*, 149 Idaho 584, 587, 237 P.3d 1210, 1213 (2010)). In reviewing such a decision on appeal, this Court conducts an "independent review" of the governing board's record. *917 Lusk, LLC*, 158 Idaho at 14, 343 P.3d at 43 (citing *Dry Creek Partners, LLC v. Ada Cnty. Comm'rs ex rel. State*, 148 Idaho 11, 16, 217 P.3d 1282, 1287 (2009)). "When the district court has affirmed a land use decision, this Court will uphold the district court's decision provided the governing board's findings were supported by substantial and competent evidence; however,

6

we freely review the district court's conclusions of law." *North West Neighborhood Ass'n*, 172 Idaho at 613, 535 P.3d at 589 (citing *917 Lusk, LLC*, 158 Idaho at 14, 343 P.3d at 43).

## III.    ANALYSIS

### A.    The Boise City Code sufficiently sets forth "express standards" for obtaining a CUP.

VPNA first contends that the City Council violated LLUPA when it interpreted and applied the Boise City Code's approval criteria for CUPs. VPNA asserts such actions by the City Council were arbitrary and capricious because, as applied, the Boise City Code did provide "express standards" as required by LLUPA.

LLUPA requires that local governing bodies make land use decisions in accordance with express standards, as established by local code or ordinance:

> The approval or denial of any application required or authorized pursuant to this chapter shall be based upon standards and criteria which shall be set forth in the comprehensive plan, zoning ordinance or other appropriate ordinance or regulation of the city or county.

I.C. § 67-6535(1). This requirement exists so that "permit applicants, interested residents[,] and decision makers alike may know the *express standards* that must be met in order to obtain a requested permit or approval." *Id.* (emphasis added). LLUPA also requires the governing board to issue a "reasoned statement" in writing to explain its decision:

> The approval or denial of any application required or authorized pursuant to this chapter shall be in writing and accompanied by a reasoned statement that explains the criteria and standards considered relevant, states the relevant contested facts relied upon, and explains the rationale for the decision based on the applicable provisions of the comprehensive plan, relevant ordinance and statutory provisions, pertinent constitutional principles and factual information contained in the record.

I.C. § 67-6535(2).

The identification of express standards to guide government bodies in making land use decisions and creating a reasoned statement that explains those decisions is essential; indeed, the "[f]ailure to identify the nature of compliance or noncompliance with express approval standards . . . shall be grounds for invalidation . . . ." I.C. § 67-6535(2)(a). Thus, LLUPA not only requires the city or county to establish express approval standards for CUPs, but also requires the governing board to issue a written decision that states the relevant facts, explains the rationale for the decision, and identifies the nature of compliance or noncompliance of the use with the express approval standards. *See generally Jasso v. Camas County*, 151 Idaho 790, 264 P.3d 897 (2011). While we will later address the adequacy of the reasoned statement issued in this case, VPNA first argues

7

that the City Council's actions in granting the CUP were arbitrary and capricious because Boise City Code did provide "express standards" as required by LLUPA.

In this case, Title 11 of the Boise City Code sets forth the relevant standards that guide the review of CUP applications, directing the PZC to review CUP applications according to seven criteria, the first five of which are relevant here:

i. The location is compatible to other uses in the general neighborhood;

ii. The proposed use will not place an undue burden on transportation and other public facilities in the vicinity;

iii. The site is large enough to accommodate the proposed use and all yards, open spaces, pathways, walls, fences, parking, loading, landscaping, and such other features as are required by this Code;

iv. The proposed use, if it complies with all conditions imposed, will not adversely affect other property of the vicinity;

v. The proposed use is in compliance with the Comprehensive Plan[.]

B.C.C. § 11-03-04.6.C(7)(a).[1] These criteria (hereafter "CUP criteria"), coupled with the Comprehensive Plan, which supplies big-picture guidance, provide the express standards by which the PZC evaluates, and ultimately approves or denies, an application for a CUP. In this case, both the PZC and the City Council directly employed the CUP criteria when evaluating the CUP application.

VPNA takes issue with the CUP criteria, alleging that they do not satisfy LLUPA because, as applied by the City Council, they are too subjective and do not provide adequate guidance for the Council's decision. Essentially, VPNA argues that the CUP criteria are not "express standards" because they are insufficient to allow applicants and interested parties to understand what is required to obtain a CUP. VPNA does not challenge the CUP criteria on their face; rather, it concedes that the criteria do not violate LLUPA's express approval criteria standard. Instead, VPNA argues that the City Council's "*interpretation* of the meaning of the [CUP criteria] is arbitrary and capricious" as the City Council "failed to articulate the guiding principles which would allow the parties, or the court, to reasonably anticipate the outcome of the decision." (Emphasis in original).

---

[1] Title 11 of the Boise City Code has since been repealed and replaced in its entirety; thus, the references to that title are to the legacy code. The parties do not dispute or contest that such legacy code provisions apply to this case, as the PZC and the Council used the code provisions then in effect.

Specifically, VPNA attacks the City Council's apparent interpretation of the terms "adversely affect" and "undue burden" found in the CUP criteria. VPNA argues that the City Council was not only required to identify the express standard governing the review of CUPs (here, the CUP criteria), but that the Council was also required to specify exactly how it interpreted the CUP criteria in this case. For example, VPNA argues that the City Council erred because it "failed to identify the amount of burden that would constitute 'undue' burden on the [Site] . . . ." Similarly, VPNA complains that the "Council struggled to decide upon what discernible amount of mitigation would be necessary to make the requisite finding that a condition eliminated adverse effects to properties in the vicinity." VPNA asserts that because the CUP criteria are so subjective, the Council should have "rel[ied] upon clarifying determining principles in reaching its decision . . . ." Because it failed to do so in this case, VPNA alleges that the Council's decision violated LLUPA's requirement that a CUP decision be based on express standards and is therefore arbitrary and capricious.

VPNA's argument is unavailing because it would render practically any set of governing standards inadequate merely because every governing body might not interpret them the same way. The Boise City Code sufficiently sets forth the requisite "express standards" by clearly laying out the criteria to be applied in considering whether to grant a CUP. *See generally* B.C.C. §§ 11-03-04.6.C(7)(a), 11-03-03.7.C. The Council reached its decision here by applying those exact criteria. On their face, the CUP criteria are express standards and are consistent with LLUPA's requirements—a fact that VPNA concedes. Further, VPNA makes no argument that the Boise City Code is unconstitutionally vague or overbroad. Importantly, while LLUPA requires the Council to identify the applicable express standards and identify aspects of the CUP's compliance or noncompliance with such standards, it does not require the Council to further define the criteria such that the Council specifies exactly how much burden is "undue" or exactly how much mitigation is "sufficient." It is unclear whether such determinations are even capable of being quantified in the manner VPNA suggests; regardless, the Boise City Code does not require it.

Because the Council's decision clearly identified and applied the relevant standards established in the Boise City Code, LLUPA's "express standards" requirement is satisfied. The Council did not need to further define its code in order to meet this requirement, as the code was sufficiently clear on its face. Thus, the City Council did not violate Idaho Code section 67-6535(1)

because it properly identified and applied the CUP criteria when it approved the CUP, and the district court's decision is upheld in this regard.

**B. The City Council's decision to reverse the PZC and grant the CUP was arbitrary and capricious and based on unlawful procedure.**

VPNA next argues that the City Council's decision to overturn the PZC's decision and grant the CUP violated its own city code; thus, it was based on unlawful procedure. Specifically, it maintains that the "Council's decision to overturn PZC's denial of the [CUP] violated the Boise [City] Code because Council failed to identify an express rationale for its decision that amounted to anything more than a difference of opinion between Council and PZC."

The Boise City Code mandates that, in order for the Council to reverse or modify the PZC's decision on appeal, the Council must first determine that the PZC erred in its determination. B.C.C. § 11-03-03.9.C(2)(b)–(c). The Code specifies that the City Council may find error on only five specified grounds. B.C.C. § 11-03-03.9.C(2)(a)(i)–(vi). The reason cited by the Council for reversing the PZC is the fifth ground: that the PZC's "decision [was] arbitrary, capricious or an abuse of discretion in that it was made without rational basis, or in disregard of the facts and circumstances presented." B.C.C. § 11-03-03.9.C(2)(v). However, the Code provides that "[w]*here there is room for two opinions*, action is not arbitrary and capricious when exercised honestly and upon due consideration." *Id.* (emphasis added).

Here, the City Council concluded that the PZC's decision to deny the CUP application was arbitrary and capricious because the PZC failed to "adequately examine whether additional conditions of approval could have brought the proposed use into compliance with the required findings for a [CUP]." The Council determined that the PZC had "stopped short of identifying, considering, and imposing . . . sufficient conditions" necessary to grant the CUP. Finally, the Council also faulted the PZC for failing to "identify [the] objective standards" and the necessary additional materials the PZC determined that IFS had failed to provide (namely, a security plan). On appeal, VPNA maintains that the City Council's decision to reverse the PZC merely reflects a "difference of opinion" with the PZC; thus, the resulting decision to grant the CUP was based on unlawful procedure by the Council. We will examine in turn each assertion of error that formed the City Council's basis for reversal.

1. *The Council erred by faulting the PZC for determining that the CUP application could not be conditioned into compliance with the CUP criteria.*

10

Based on the evidence before it, the PZC determined that the CUP application could not be conditioned in a manner that would render it compliant with the CUP criteria. One reason the PZC cited in reaching this conclusion was IFS's failure to submit a security plan, stating that the lack of such a plan prevented it from having an adequate basis for imposing appropriate conditions on the CUP. On appeal, the Council determined that such actions by the PZC were improper, noting that the PZC should have essentially rehabilitated IFS's application by creating and imposing a plethora of potential conditions that could have brought the proposed use into compliance with the CUP criteria. The Council also admonished the PZC for faulting IFS for its failure to provide information about its security plans for the shelter. The question before this Court is whether the Council acted arbitrarily and capriciously, or utilized unlawful procedure, when it determined that the PZC erred by concluding that the CUP could not be conditioned into compliance with the CUP criteria.

The Respondents defend the Council's conclusion that the PZC failed to consider and impose sufficient mitigating conditions and maintain that the Council's decision to reverse the PZC on appeal did not reflect a mere difference of opinion. In the Council's view, the PZC wrongly faulted IFS for failing to provide something (the security plan) that was not required for the application under the Boise City Code. The Respondents note that it is undisputed that "there was no requirement in Boise City Code that [IFS] submit [security] plans as part of the [CUP] application." The Respondents argue that "[b]y VPNA's logic and that of the PZC's decision, CUP applicants would be obligated to surmise and submit the correct set of approval conditions to mitigate adverse impacts yet to be determined by the decision-maker, and the correct set of application materials whose relevance is also yet unknown." The Respondents reject the idea that the PZC needed the security plan to properly condition the CUP, asserting that such a position "ignores that the PZC had authority to require that very plan as an approval condition with whatever elements the PZC deemed necessary."

While the Respondents accurately note that the Boise City Code did not require IFS to submit a security plan, their arguments are still inapt. The Respondents mistakenly assert that the PZC is *required* to consider and impose conditions that would render the CUP compliant with the CUP criteria. In other words, the Respondents assume that the PZC may not deny an application if it can impose any conceivable conditions that might address any identified deficiency. However, the Boise City Code does not limit the PZC in this manner. The PZC is directed to consider and

11

review the information and evidence *before it*. *See* B.C.C. § 11-03-03. The PZC is tasked with determining whether a CUP application conforms with the CUP criteria and, if it conforms, the PZC is directed to approve the CUP—if it does not conform, the PZC must deny the CUP. B.C.C. § 11-03-04.6.C(7)(a). The Code also provides that the PZC "*may* impose conditions as needed to ensure that the approval is consistent" with pertinent standards. B.C.C. § 11-03-03.7.D (emphasis added). However, the PZC's ability to impose conditions is a *permissive function*, not a mandatory one; neither the PZC nor the Council is required to create, consider, or impose conditions when it finds that an application for a CUP is deficient. *Id.*; *see also* B.C.C. § 11-03-04.6.C(7)(b) (similarly stating that "[t]he PZC *may* impose conditions" (emphasis added)).

Here, both the PZC and the Council agreed that, on its face, the CUP application did not meet the CUP criteria. Instead, the more complicated question for each decision-making body was whether the CUP application could be conditioned in a manner that would render it compliant with the CUP criteria. Ultimately, the PZC determined that it could not be so conditioned, in part because it lacked information—information that it repeatedly requested from IFS—that it could rely on to create and impose conditions sufficient to render the proposed use compliant.

As acknowledged by the City's attorney at oral argument, members of the PZC collectively possess extensive knowledge and broad expertise in land use planning and development matters. The record reflects that they dedicated significant time and effort to considering potential conditions for the proposed use. The PZC even reviewed and considered several of the conditions that the Council later imposed when the CUP was ultimately approved. To name just a few, the PZC specifically discussed disallowing overflow at the shelter, requiring regular check-in meetings with the neighbors on an annual basis rather than on one single occasion, and requiring preparation of a compliance report for check-in meetings. The PZC also considered "limiting the number of beds" to reduce adverse impacts. However, the PZC ultimately concluded that any combination of potential conditions would be inadequate to mitigate the adverse impacts on properties in the vicinity and the undue burden to public facilities caused by the proposed use. Individual PZC commissioners expressed their opinion that the proposed use—even with the imposition of conditions—would not satisfy the CUP criteria. One PZC commissioner expressed that she was not confident that the conditions would mitigate the adverse impacts of the shelter. Other commissioners emphasized that the lack of a security plan from IFS made it particularly difficult to determine whether adverse impacts could be mitigated by conditions. Another PZC

12

commissioner likewise acknowledged it was not the PZC's job to create conditions when it had insufficient information to do so.

This confirms what was stated in the PZC's decision: that it did consider the imposition of potential conditions, but concluded that, based on the evidence before it, the CUP application could not be brought into compliance with the CUP criteria even with the imposition of conditions. Moreover, it found that "the application materials did not allow [us] to identify adequate conditions to mitigate adverse impacts in light of the record and agency comments." Thus, the PZC believed it could not craft appropriate conditions without more information from the applicant. Because the PZC's consideration of whether to impose conditions was discretionary, we conclude that the Council's determination that the PZC erred by failing to consider and impose a slew of additional potential conditions was arbitrary and capricious. Like the Council, the PZC was permitted to consider potential conditions; however, it was not required to impose any conditions, let alone the specific ones identified later by the Council.

Likewise, the Council's conclusion that the CUP could be conditioned into compliance with the CUP criteria reflects a difference of opinion over whether that result could be achieved. In reaching the opposite conclusion as the PZC, the Council simply determined that the imposition of certain conditions would be sufficient to satisfy the CUP criteria, despite failing to point to a valid deficiency in the reasoning or logic of the PZC. Nothing in the Council's decision establishes that it was anything other than a difference of opinion between two bodies reaching an opposite conclusion based on the same evidence.

Finally, it was not an error by the PZC to note IFS's failure to provide information regarding its proposed security plan. While the PZC emphasized the need for a security plan, it did not know *what the security plan should entail*; therefore, it could not craft a condition that adequately addressed the plan requirements. By requesting that IFS provide such information, the PZC was not seeking to require IFS to concoct conditions for itself; rather, it was simply asking IFS to provide enough background information for it to know what, if any, conditions might be necessary and effective to ensure compliance with the CUP criteria. Further, the fact that the PZC specified the security plan as information necessary for it to properly consider potential mitigating conditions belies the Council's finding that the PZC did not "identify objective standards for, and all necessary elements of, the plans and further application materials" that IFS failed to provide. The PZC pointed to the CUP criteria and cited the lack of assurances from BPD that it could

13

mitigate adverse impacts from the shelter, coupled with the lack of a security plan from IFS, as reasons for the denial.

2. *The Boise City Code does not authorize the Council to conduct a de novo review of the PZC decision.*

The Respondents argue that the City Council was entitled to conduct a de novo review of the PZC proceedings and was free to make its decision absent any consideration of the PZC's determinations. In this regard, they argue that the Council did not act on unlawful procedure in concluding that the PZC's decision was arbitrary and capricious. As support for this argument, the Respondents cite to three provisions of the Boise City Code that they suggest are consistent with a de novo type review. The Respondents accurately point out that the PZC "function[s] at the direction of the Council." B.C.C. § 11-02-02.1. Likewise, while the PZC has the authority to grant or deny a CUP, that decision is not final if it is appealed to the Council. In such cases, the Council then becomes the final decisionmaker if it modifies the CUP. *See* B.C.C. § 11-03-03.9.C(2). Finally, when the Council conducts a public hearing on appeal, the code does not limit or restrict the evidence or arguments offered at the public hearing. *See* B.C.C. § 11-03-03.9.C(1)(d)-(e).

Despite certain provisions of the Boise City Code being consistent with free review on appeal, other provisions of the code make it clear that the City Council does not review decisions by the PZC on a de novo basis. For the City Council to "reverse or modify" the PZC, it must first find that the PZC committed an error enumerated among the five grounds specified by the Code. B.C.C. § 11-03-03.9.C(2)(b). If the Council does not find such an error, then the Code expressly states that "the appeal shall be denied and the decision upheld." B.C.C. § 11-03-03.9.C(2)(c). As noted above, the Council is limited in its review—it can only find the PZC committed error on the following grounds:

> i. The decision is in violation of constitutional, state, or city law. An example would be that the review body's decision would be a taking.
>
> ii. The review body's decision exceeds its statutory authority.
>
> iii. The decision is made upon unlawful procedure. An example would be if notice of a required public hearing was inadequate. In such cases, the matter may be remanded to correct the error.
>
> iv. The decision is arbitrary, capricious or an abuse of discretion in that it was made without rational basis, or in disregard of the facts and circumstances presented. Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration.
>
> v. The decision is not supported by substantial evidence.

14

B.C.C. § 11-03-03.9.C(2)(a)(i)–(vi). Thus, a prerequisite to the Council reversing or modifying a decision from the PZC is a finding that the PZC committed one of the specified errors.

Notably, this standard is set forth in the Boise City Code and was adopted by the City Council itself. Thus, any concerns about the wisdom or effectiveness of this system are up to the City Council to resolve. Indeed, we note that the Council has recently updated this standard of review in its newly overhauled development code. However, the code provisions in effect at all times relevant to this case plainly required a specific finding of error among the five grounds identified in the Code before the Council could modify or reverse the PZC's decision. This Court cannot retroactively rewrite the Boise City Code. We, like the City Council, are bound to follow the plain meaning of the code as written and in effect at the times relevant to the case.

Accordingly, we conclude that, under the provisions of the Boise City Code in effect at the time of its decision, the Council was not permitted to conduct a de novo review of the PZC's decision. Absent a showing that the PZC decision violated one of the five grounds identified in the Boise City Code, the Council had no authority to second-guess the PZC's decision by way of de novo review.

3. *Whether the City Council followed the Boise City Code in reversing or modifying the PZC's decision is a proper issue for judicial review by the Court*

The Respondents next argue that the Council's determination that the PZC committed error was not a final decision; therefore, it is not subject to judicial review. The Respondents argue that "[n]o statute authorizes review of the Council's conclusion that the PZC committed error," and that "the PZC's intermediate decision has been displaced by the Council's final decision," which is the only reviewable decision under Idaho Code section 67-6521.

This argument is unavailing for two reasons. First, the City Council made its determination of the PZC's error as a part of its final decision granting the CUP. Thus, VPNA is "not directly challenging the finding of error as an independent decision," nor is VPNA challenging the PZC's "intermediate decision." Second, and more importantly, VPNA is arguing that the Council's final determination that the PZC erred was arbitrary and capricious and based on unlawful procedure. LLUPA explicitly allows a reviewing court to find error on these grounds. I.C. § 67-5279(3)(c). Accordingly, whether the City Council followed the Boise City Code in reversing or modifying the PZC's decision is a proper issue for judicial review by the Court. By doing so, this Court is reviewing the Council's actions, not the PZC's.

15

In the end, the City Council simply disagreed with the PZC that the CUP could be conditioned into compliance with the CUP criteria. For these reasons, the City Council erred by faulting the PZC for determining the application would not meet the CUP criteria, even with the imposition of potential conditions. Therefore, its decision was arbitrary and capricious, and based on unlawful procedure. Accordingly, the district court's conclusion that the City Council's decision was not based on unlawful procedure must be reversed and the agency action set aside upon remand to the district court. I.C. § 67-5279.

**C. The City Council's reasoned statement rejecting the PZC's denial of IFS's application was inadequate under LLUPA and deprived VPNA of due process.**

It is well established that LLUPA requires a decision-maker to issue a written statement in support of its decision, setting forth the relevant contested facts relied upon, and explaining the criteria and standards it considered relevant. I.C. § 67-6535(2). This requirement serves multiple functions. As stated by this Court in *Jasso v. Camas County*:

> The requirement of meaningful administrative findings serves important functions, including "facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearing and judicial review and keeping within their jurisdiction."

151 Idaho 790, 794, 264 P.3d 897, 901 (2011) (quoting *Idaho Underground Water Users Ass'n v. Idaho Power Co.*, 89 Idaho 147, 156, 404 P.2d 859, 863 (1965)). It is a key requirement that the reasoned statement "provide[] the reviewing court with the guidance necessary to review the record . . . ." *Id.* at 794–95, 264 P.3d at 901–02. LLUPA also provides that the

> [f]ailure to identify the nature of compliance or noncompliance with express approval standards or failure to explain compliance or noncompliance with relevant decision criteria shall be grounds for invalidation of an approved permit or site-specific authorization, or denial of same, on appeal.

I.C. § 67-6535(2)(a).

On multiple occasions, this Court has considered whether written statements issued by local governing boards satisfied this requirement. We surveyed those cases in *Jasso*:

> In *Crown Point Development, Inc. v. City of Sun Valley*, the purported findings of the city council were merely recitations of portions of the record, rather than determinations of the facts disputed by the parties. 144 Idaho 72, 77–78, 156 P.3d 573, 578–79 (2007). This Court found the "findings" to be inadequate. *Id.* In *Workman Family Partnership v. City of Twin Falls*, the city council's factual findings explained that a rezone application was denied because the rezone imposed "[t]oo great a change," would devalue nearby residential

16

properties, and "would violate the integrity of existing residential zoning districts." 104 Idaho 32, 37, 655 P.2d 926, 931 (1982). We held that "[t]he reasons listed for the denial of the application . . . are basically conclusions. Nothing . . . reveals the underlying facts or policies that were considered by the Council. The reasons listed . . . provide very little insight into the Council's decision." 104 Idaho at 38, 655 P.2d at 932. In *Cooper v. Board of County Commissioners of Ada County*, the Court held that a board of county commissioners' findings and conclusions, supplemented by a staff report that stated some of the shortcomings for which the application was denied, were inadequate where the board denied the application "because of items 1, 2, 3 and 4 and Agricultural Policies No. 4 and No. 5 and also because of the school district." 101 Idaho 407, 408–09, 614 P.2d 947, 948–49 (1980).

*Jasso*, 151 Idaho at 794, 264 P.3d at 901 (alterations in original). This Court has held that a "reasoned statement must plainly state the resolution of factual disputes, identify the evidence supporting that factual determination, and explain the basis for legal conclusions, including identification of the pertinent laws and/or regulations upon which the legal conclusions rest." *Id.*

In its brief, IFS argues that amendments to LLUPA altered this requirement and eliminated the need for official findings of fact and conclusions of law. While the Idaho Legislature removed the language from LLUPA that required "findings of fact and conclusions of law" in 1999, it replaced such language with a standard having the same practical result: requiring the decisionmaker to explain its decision, state the facts relied upon, explain the rationale, and identify the relevant criteria. *See* Act of Mar. 29, 1999, ch. 396, 1999 Idaho Sess. Laws 1099, 1111. Thus, the purported effect of the 1999 amendments to LLUPA would not alter the result in this case.

In *Jasso*, this Court found the written decision of the local governing board to be inadequate where it contained only "recitations of procedural history, not findings of fact" and where "[t]he Board's conclusions of law contain[ed] no explanatory language whatsoever, instead offering only broad conclusions." *Id.* at 795, 264 P.3d at 902. We noted that, *even if inferences could be made* by a reviewing court to support the governing board's implied findings and legal conclusions, doing so is not the responsibility or role of the reviewing court. *Id.* at 795–96, 264 P.3d at 902–03. Rather, "[Idaho Code section] 67-6535 requires more than conclusory statements from which a decision-maker's resolution of disputed facts and legal reasoning may be inferred." *Id.* at 795, 264 P.3d at 902. Accordingly, where "nothing in the Board's conclusions reveal[ed] that the Board considered any underlying specific fact or source of law," the written decision was deemed inadequate. *Id.* Likewise, when the decision-maker "[does] not explicitly respond to the factual and legal questions raised by the parties, and it manifestly fail[s] to provide an explanation as to

17

how the . . . application complied with [relevant] ordinances," the written statement does not satisfy LLUPA. *Id.*

1. *The City Council's reasoned statement was conclusory and failed to adequately resolve the pertinent factual disputes.*

VPNA argues that given the highly contested nature of the proceeding, the reasoned statement did not sufficiently "resolve[] outstanding factual and legal disputes" necessary to understand how the City Council reached its decision." It posits that the statement is conclusory and does not adequately resolve the disputes at issue in the CUP proceedings. VPNA notes that, despite extensive evidence demonstrating that the proposed shelter would adversely affect surrounding properties and be an undue burden on public facilities, the Council nonetheless determined that it would not cause such effects.

An examination of the Council's reasoned statement supports VPNA's arguments. In response to a controversial and information-dense CUP appeal, the City Council rendered a one and one-half page reasoned statement, along with 30 new conditions for approval. The body of the reasoned statement contained five paragraphs of text purporting to explain the Council's reasoning for determining that the PZC was incorrect and that the CUP satisfied the CUP criteria. While the reasoned statement touched on relevant factors and pieces of information important to the Council's decision, we agree that it was conclusory and flatly failed to resolve the outstanding factual disputes that were before the Council.

Our conclusion is borne out by the Council's decision itself. For example, the paragraph dedicated to the Council's determination that the shelter will not "adversely impact" other property addressed this criterion in the following manner:

> Conditions of approval will ensure that the shelter does not adversely impact other property in the vicinity. This includes requirements associated with the operation of the facility, limits on occupancy, property maintenance and upkeep, design elements, and improvements to the site and the adjacent right-of-way. In many ways, the conditions restrict the intensity of the use and integrate it more predictably with the neighborhood and with public facilities so that externalities can be minimized, such as potential nuisances on the site and calls for service from public safety agencies. Ongoing compliance with these conditions of approval will be subject to review at six months after occupancy, and on an annual basis moving forward.

While this paragraph begins to explain the City Council's reasoning, it stops well short of explaining how any of the newly imposed conditions will address the concerns raised by VPNA

18

and others. There was intense dispute over the anticipated impacts of the proposed use, which only amplified the importance of and need for a reasoned statement that adequately addressed the disputed issues and provided satisfactory explanations for its conclusions. The parties presented extensive testimony and evidence on this issue, and it is the one criterion that a majority of the Council members struggled with the most. Yet, the reasoned statement does not attempt to wrestle with any of the controversy and instead summarily concludes that its new conditions will resolve any problems. Such a conclusory paragraph deprives this Court of the Council's reasoning, which is necessary for us to conduct a meaningful review. Simply put, the statement makes conclusions without sufficient explanation and does not adequately endeavor to resolve the intense dispute over whether the use will impact nearby properties. It lacks necessary factual support and does not "explicitly respond to the factual and legal questions raised by the parties." *Jasso*, 151 Idaho at 795, 264 P.3d at 902.

The same is true regarding the Council's decision on whether the proposed use would create an "undue burden" on public facilities. Addressing this criterion, the reasoned statement states in full:

> Correspondence from commenting agencies confirms that the conversion from a retail establishment to the proposed home will not place an undue burden on the transportation system or other public facilities. As the responsible agencies in public safety, the Boise Police Department and Boise Fire Department recommended conditions of approval that could be placed on the application to address potential burdens and adverse impacts, and these were included as conditions of approval. Conditions also address transportation burdens.

Again, the Council provided a short, conclusory explanation for its determination that the CUP would not cause an undue burden on public facilities. While generally noting the conditions recommended by BPD and BFD, the City Council failed to identify how the conditions would address concerns and failed to cite specific evidence supporting any of its factual findings. For example, the reasoned statement recognizes that BPD and BFD "recommended conditions of approval that could be placed on the application to address potential burdens and adverse impacts, and these were included as conditions of approval." However, the reasoned statement does not explain what these conditions entail, or why they would eliminate any undue burden on public facilities. Similarly, merely stating that "[c]onditions also address transportation burdens," is plainly insufficient.

19

Likewise, the Council's written decision fails to explain its conclusion that the CUP would comply with the Comprehensive Plan. The reasoned statement addresses the Comprehensive Plan in the following manner:

> The proposed shelter use is consistent with the Comprehensive Plan, including elements focused on sustainability *(Policy ES9.5),* housing, social services, and transit-oriented development. The plan promotes housing and services along transit routes maximizing accessibility to those in need. (*Goal SHCC15 and Policy SHCC14.2*) The plan also includes a host of policies supporting housing like the proposed shelter use. *Goal NAC9* promotes housing of low- and moderate-income households. *Policy NAC 9.5* identifies the need for housing for those experiencing homelessness. The shelter will also provide housing for those in need along an existing transit corridor. (*Principle GDP-C.5 and Policy NE-CCN2.5*) In addition to housing, the facility will provide a host of support services.

While the reasoned statement addresses some aspects of the CUP's compatibility with the Comprehensive Plan, it fails to address the CUP's apparent conflict with the Plan, which requires that shelters, like the one proposed by IFS, should exist downtown, not in primarily residential areas such as Northwest Boise. Although the Comprehensive Plan does not "clearly and expressly direct[] shelter use . . . to occur in the downtown Boise area," as VPNA suggests, it does implicitly suggest as much. For example, the Plan addresses homeless shelters in the section related to Downtown Boise, providing guidance for establishing such services; and notably, the Plan does not specifically address shelters anywhere else, including in the section of the Plan related to Northwest Boise (the location of the proposed shelter). In fact, the section dedicated to Northwest Boise primarily focuses on improving the economic development of the area.

The Respondents correctly note that "[a] comprehensive plan is not a legally controlling zoning law, it serves as a guide to local government agencies charged with making zoning decisions." *Evans v. Teton County*, 139 Idaho 71, 76, 73 P.3d 84, 89 (2003). Additionally, when a zoning ordinance requires conformity with a comprehensive plan, this Court has held that it only requires the project to "generally comport[] with the overall goals" of the plan. *Urrutia v. Blaine County*, 134 Idaho 353, 358, 2 P.3d 738, 743 (2000). However, the question is not whether the CUP *actually complied* with the Plan, but rather whether the Council *adequately explained its apparent lack of compliance* with the Plan. *See* I.C. § 67-6535(2)(a). Here, the reasoned statement does not address or even attempt to resolve the apparent conflict with the Plan in any way, further demonstrating its inadequacy.

When analyzing each of the reasoned statement's shortcomings here, this Court's recent decision in *North West Neighborhood Association v. City of Boise* is particularly instructive. 172 Idaho 607, 614–17, 535 P.3d 583, 590–93 (2023). There, we determined that an earlier written decision of the City Council did not satisfy LLUPA. *Id.* North West Neighborhood Association ("NWNA") challenged the City Council's reversal of the PZC's denial of a PUD. *Id.* at 613, 535 P.3d at 589. NWNA also challenged the application for a rezone. *Id.* In both instances, it argued that the written statement from the City Council was inadequate under LLUPA because it did "not provide a rationale for the approvals based on the relevant standards and factual findings." *Id.* at 614, 535 P.3d at 590. At issue in the application process was whether the project could comply with the "4-minute level of fire service set forth in the Comprehensive Plan," and whether the project was "in the best interests of the public's general welfare." *Id.* at 617–18, 535 P.3d at 593–94. The reasoned statement "consisted of one and one-half pages of text with seven additional pages of standard conditions," despite there being an extensive, nearly 4,000-page record. *Id.* at 613, 616, 535 P.3d at 589, 592.

In *North West Neighborhood Association*, when addressing the rezone, the reasoned statement did not contain any reference to the fire service-level issue. *Id.* This Court stated that:

> The City Council's reason for decision fails to address the fire service issue in any way and is in violation of the requirements of [Idaho Code] section 67-6535(2). The City Council must explain in a reasoned decision whether the project complies with the level of fire service set forth in the Comprehensive Plan and whether the project is in the best interests of the public's general welfare, and the City Council must also set forth the facts upon which it relies to make those determinations.

*Id.* at 618, 535 P.3d at 594. The reasoned statement section addressing the PUD decision similarly failed to satisfy LLUPA. *Id.* There, the City Council did "not clearly identify the standard of review that guided the Council's decision." *Id.* Additionally, the reasoned statement was also insufficient because it addressed the fire issue by stating: "Comments from public agencies confirm the project will not place an undue burden on the transportation system or other infrastructure in the neighborhood." *Id.* This Court determined that the statement was conclusory and lacked the necessary supporting factual determinations, rendering it in violation of LLUPA. *Id.* In sum, this Court concluded that it could not "engage in meaningful judicial review because no findings of fact have been presented to the Court and the Council's one and one-half page 'reason for decision' [was] largely conclusory and [did] not identify decision criteria or address the fire safety or traffic issues raised by NWNA in any meaningful fashion." *Id.* at 616, 535 P.3d at 592.

21

Like the reasoned statement in *North West Neighborhood Association*, the statement at issue here is deficient. Despite lengthy agency proceedings involving voluminous evidence, the City Council produced a short, reasoned statement (compare *North West Neighborhood Association*, with an approximately 4,000-page record and a one and one-half page reasoned statement and seven pages setting forth 64 conditions[2], to this case, which features an approximately 100,000-page record with a one and one-half page reasoned statement and four pages setting forth 30 conditions). Furthermore, the reasoned statement here is conclusory in many of the same ways as the one we rejected in *North West Neighborhood Association*; in fact, in places, it parrots almost the exact language this Court found to be conclusory in that case. For example, compare the Council's statement in this case ("Correspondence from commenting agencies confirms that the conversion from a retail establishment to the proposed shelter will not place an undue burden on the transportation system or other public facilities"), with the Council's statement in *North West Neighborhood Association* ("Comments from public agencies confirm the project will not place an undue burden on the transportation system or other infrastructure in the neighborhood."). *Id.* at 617, 535 P.3d at 593. The reasoned statements in both cases mirror the same structure: citing to the relevant criterion and then making broad conclusions about compliance; pointing to reports and evidence generally but failing to provide and explain the factual basis for its conclusions in any detail.

The Respondents point out that the reasoned statement incorporated the 30 "conditions of approval" by reference and argue that these conditions help provide explanatory support for the Council's decision. However, while this Court can certainly read the conditions in concert with the reasoned statement, the ultimate result is unchanged. The reasoned statement itself fails to specify or explain which condition relates to which determination and application of the CUP criteria. VPNA, along with any reviewing court, remains in the dark as to which conditions the Council found to be important to mitigate the "adverse effects" to properties, or reduce the "undue burden" to public facilities. And as this Court made clear in *Jasso*, LLUPA "requires more than conclusory statements from which a decision-maker's resolution of disputed facts and legal reasoning may be inferred." 151 Idaho at 795, 264 P.3d at 902. Without a clear explanation or

---

[2] While the Boise City Council in *North West Neighborhood Association* only listed 24 "standard conditions" to the CUP, many of them were broken down into sub-conditions, effectively expanding the total number of conditions to 64.

guidance from the Council, the potential explanatory power of the conditions is undermined by the numerous inferences we would be required to make in order to give effect to the otherwise insufficient factual findings and legal conclusions contained in the reasoned statement.

It is for these reasons that we conclude that the reasoned statement at issue here was inadequate under LLUPA. We note that VPNA also argued in its brief that the reasoned statement was inadequate because it did not assign a relative weight to its various findings in support of the CUP approval. Essentially, VPNA argues that the Council should have identified exactly how much impact was permissible under the CUP criteria, then identified exactly how much impact was going to occur in this case, and then identified whether that impact crossed the threshold of permissible impact. However, to be clear, LLUPA does not require the decisionmaker to identify and apply any additional standards beyond those already specified in its code, nor does it require the City Council to articulate in its reasoned statement *exactly how much adverse impact* would be a violation of the criteria. Thus, that argument by VPNA finds no purchase with this Court.

We conclude that the reasoned statement at issue here was conclusory and did not adequately explain its factual findings and legal conclusions; therefore, it violated LLUPA. For these reasons, we reverse the district court's determination that the City Council issued a sufficient reasoned statement. As in *Jasso* and *North West*, the City Council's failure to provide an adequate reasoned statement "necessitates that the approvals of the applications be invalidated pursuant to Idaho Code section 67-6535(2)(a)." *North West*, 172 Idaho at 619, 535 P.3d at 595.

2. *This Court will not scour the record on appeal for evidence that may support the City Council's implied findings and legal conclusions.*

The Respondents contend that, even if the reasoned statement itself is conclusory or otherwise inadequate, this Court can review the 100,000-page record and determine for itself whether it contains substantial and competent evidence to support the decisionmaker's reasoned statement. In support of this proposition, the Respondents point to *Evans v. Teton County*, where this Court indicated that a governing board's decision may be upheld when "the required information can be found in the record produced during the application process," even if the board could have been more specific and extensive in its written decision. *Evans*, 139 Idaho at 81, 73 P.3d at 94. The Respondents maintain that this Court should opt to do the same in this case.

However, in *Jasso*, this Court later clarified the holding in *Evans* and emphasized that the findings of the board cannot be "bald conclusions," and the written statement must nonetheless

23

provide "the reviewing court with the guidance necessary to review the record because they contained a reasoned explanation of the grounds upon which the board's decision was based." *Jasso*, 151 Idaho at 794–95, 264 P.3d at 901–02. We reiterated that "[i]t is not the role of the reviewing court to *scour the record for evidence* which may support the decision-maker's implied findings and legal conclusions." *Id.* at 795, 264 P.3d at 902 (emphasis added).

The Respondents also rely on *State of Idaho, Department of Health and Welfare v. Doe (2023-25)*, where this Court upheld a redisposition order issued by the magistrate court, despite it not containing an adequate finding of fact. 173 Idaho 32, 538 P.3d 805 (2023). There, citing both *Jasso* and *Evans*, this Court noted that in certain circumstances, "a reviewing court may overlook otherwise inadequate findings and conclusions if the record contains substantial and competent evidence to support the decision-maker's findings and conclusions." *Id.* at 43, 538 P.3d at 816. This Court applied the rule to that case for two reasons:

> First, because the magistrate court explained the reasons for its decision in detail on the record following the receipt of testimony from multiple witnesses, we may overlook the otherwise inadequate findings and conclusions of the magistrate court's form order and rely on that substantial evidence. Second, because federal regulations governing Idaho's foster care system permit court transcripts to be used as acceptable documentation of judicial determinations of the best interest of the children and reasonable efforts to eliminate the need for shelter care, we likewise uphold the magistrate court's decision here.

*Id.* Thus, while this Court may look to the record to determine whether it contains substantial and competent evidence supporting the decision-maker's findings and conclusions, this Court has only done so in certain situations.

The situation in this case is readily distinguishable from the one in *Doe (2023-25)* for a few reasons. Most importantly, the City Council did not explain the reasons for its decision in detail following the public hearings. While the Council deliberated *before* reaching a decision and individual council members provided some insight into their personal thoughts, such statements are fundamentally different from the Council, as a unified body, explaining its decision *after* reaching it. Moreover, the Respondents would have this Court sift through an administrative record of over 100,000 pages, searching for substantial and competent evidence to support the City Council's decision. The reasoned statement here neither points to where such evidence might be found, nor does it provide a "reasoned explanation" that provides the "guidance necessary [for this Court] to review the record." *Jasso*, 151 Idaho at 794–95, 264 P.3d at 901–02. As we have repeatedly held in the past, we decline to dive into a sea of documents in search of hidden pearls

24

that might bolster a governing body's unsupported decision. *Id.* at 795, 264 P.3d at 902 (We will not "scour the record for evidence which may support the decision-maker's implied findings and legal conclusions").

For all these reasons, the City Council's reasoned statement was conclusory and failed to adequately state the resolution of factual disputes, identify the evidence supporting its factual determination, and explain the basis for its legal conclusions. Accordingly, because the Council's actions violated LLUPA and failed to uphold VPNA's due process rights, we conclude that the district court erred in affirming the Council's actions.

### D. VPNA demonstrated a prejudice to its substantial rights.

Having established that the City Council made an error by approving the CUP application, VPNA must also establish that this error harmed its substantial rights. I.C. § 67-5279(4). Respondents assert that VPNA has failed to do so. We disagree. We have held that "due process rights are substantial rights." *Jasso*, 151 Idaho at 796, 264 P.3d at 903 (quoting *Eddins v. City of Lewiston*, 150 Idaho 30, 36, 244 P.3d 174, 180 (2010)). Accordingly, "[t]he failure to provide a reasoned statement that enables this Court to engage in meaningful judicial review [deprives a party] of its substantial right to due process." *North West Neighborhood Ass'n*, 172 Idaho at 619, 535 P.3d at 595.

Here, we conclude that VPNA's substantial right to due process was violated by the inadequate reasoned statement issued by the City Council in this case. As we previously noted, a reasoned statement that prevents this Court from engaging in meaningful judicial review deprives a party of its substantial right to due process. *Id.*; *see also Jasso*, 151 Idaho at 797, 264 P.3d at 904 (holding that the failure to provide a decision that facilitates judicial review violates a party's substantial right to due process). Because the Council failed to provide a reasoned statement adequately explaining its decision, we do not possess the necessary information to meaningfully review its decision. Therefore, it "necessitates that the approvals of the applications be invalidated pursuant to Idaho Code section 67-6535(2)(a)." *North West Neighborhood Ass'n*, 172 Idaho at 619, 535 P.3d at 595.

Accordingly, we reverse the district court's decision and remand with instructions to invalidate the Council's actions reversing the PZC and granting the CUP. LLUPA directs that a "[f]ailure to identify the nature of compliance or noncompliance" of the proposed use with "express approval standards or . . . relevant decision criteria *shall be grounds for invalidation of*

*[the] approved permit, . . . or denial of same*, on appeal." I.C. § 67-6535(2)(a) (emphasis added). Similarly, when the Council's action is found to be arbitrary and capricious, or based on unlawful procedure, "it shall be set aside, in whole or in part, and remanded for further proceedings as necessary." I.C. § 67-5279(3).

In *North West Neighborhood Association*, we reversed the district court's decision on the sole basis that the reasoned statement issued by the City Council was inadequate. 172 Idaho at 619, 622, 535 P.3d at 595, 598. Thus, we remanded the case to the district court with instructions to (1) invalidate the City Council's actions and (2) remand for the City Council to adopt a proper reasoned statement. *Id.* While we have also determined that the reasoned statement in this case was inadequate, remanding with instructions to adopt a new reasoned statement is not possible because we have also concluded that the Council's decision itself was improper—i.e., that it was arbitrary and capricious *and* based on unlawful procedure. For this reason, merely remanding the case to the Council with instructions to adopt an adequate reasoned statement would not cure the impropriety of the decision to reverse the PZC itself. Thus, in this instance the district court is instructed to invalidate the City Council's approval in its entirety.

### E. We need not address whether the district court erred by denying VPNA's motion for remand.

VPNA also argues on appeal that the district court erred in denying its motion to stay the proceedings and remand back to the City Council to consider further evidence. IFS submitted a Design Review Application, which was approved on October 12, 2022, months after the Council's final decision on the CUP. VPNA alleges this Design Review Application contained "substantial and material" modifications from the original plans and specifications conditioned by the City Council in the approval of the CUP, thus affecting the factual finding by the City Council that the design of the building could mitigate adverse impact to the properties in the vicinity. However, because we are reversing the decision of the district court and remanding with instructions to invalidate the approval of the CUP, we need not address this issue.

### F. VPNA is not entitled to attorney fees on appeal.

In a proceeding where a state agency and a person are adverse parties, this Court may award the prevailing party attorney fees on appeal if we determine that the non-prevailing party acted without a reasonable basis in law or fact. I.C. § 12-117(1). Here, VPNA argues that the City Council acted without a basis in law or fact when finding that there would be no adverse impacts

26

in the face of overwhelming evidence demonstrating otherwise. VPNA also argues that the City Council acted without a reasonable basis where it overturned the PZC's decision based on what VPNA alleges to be a mere difference of opinions.

However, as in *North West Neighborhood Association*, "we cannot conclude that the City acted without a foundation in fact or law in defending on appeal the judgment it won in the district court." 172 Idaho at 622, 535 P.3d at 598. Neither the City Council nor the district court had the benefit of the guidance we provided in *North West Neighborhood Association* when making their respective decisions. Therefore, we conclude that VPNA is not entitled to attorney fees on appeal.

## IV.    CONCLUSION

For the foregoing reasons, we conclude that (1) the City Council's decision to grant the CUP was arbitrary and capricious and based on unlawful procedure; (2) the Council's reasoned statement was inadequate under LLUPA; and (3) VPNA suffered prejudice to its substantial rights. Accordingly, we reverse the district court's decision affirming the Council's approval of the CUP and remand with instructions to invalidate the actions of the City Council. VPNA is awarded costs pursuant to Idaho Appellate Rule 40(a), but no attorney fees are awarded on appeal.

Chief Justice BEVAN, Justices BRODY, ZAHN and MEYER CONCUR.